UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CYNTHIA M. ZECHENELLY                     CIVIL ACTION

VERSUS                                    NUMBER: 13-0403

CAROLYN W. COLVIN, ACTING                 SECTION: "B"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Disability Insurance Benefits ("DIB").  (Rec. docs. 12, 14).

Cynthia M. Zechenelly, plaintiff herein, filed the subject application for DIB on December 22, 2010, alleging disability as of April 1, 2007.  (Tr. pp. 188-191).  In a "Disability Report" that appears in the record, the conditions resulting in plaintiff's inability to work were identified as rheumatoid arthritis ("RA"), stage II cirrhosis of the liver, bipolar disorder, severe anxiety, attention deficit hyperactivity disorder ("ADHD"), and attention

deficit disorder ("ADD"). (Tr. p. 197). Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on February 10, 2011. (Tr. pp. 107-110). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on November 1, 2011 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 114-115, 43-100). On December 22, 2011, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 24-42). The Appeals Council subsequently denied plaintiff's request for review of the ALJ's decision on December 28, 2012, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-7). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

To better facilitate a resolution of the matter at hand, a recitation of some procedural history is in order. The subject application for DIB is a serial one, it being at least plaintiff's second attempt at securing such benefits. According to a "Disability Report Field Office" form that appears in the record below, plaintiff had filed a previous application for DIB that was denied at the initial level of the Commissioner's administrative

review process on February 13, 2009.  (Tr. p. 193).[1]  In her
cross-motion for summary judgment, plaintiff indicates that she was
subsequently afforded a hearing before an ALJ on that prior
application who issued an unfavorable decision on November 23,
2009.  (Rec. doc. 12-1, p. 1).  A review of that decision, which
plaintiff has attached to her cross-motion, reveals that she had
alleged in that prior application the same disability onset date of
April 1, 2007.  (Rec. doc. 12-4, p. 3).  As further reflected by
that decision, what is also clear is that plaintiff's insured
status and consequent entitlement to DIB expired on June 30, 2008.
(Id. at pp. 3, 5).  Thus, just like that prior application for DIB,
at issue in the second one was the relatively brief relevant time
period from April 1, 2007, the alleged onset date, until June 30,
2008, the date plaintiff's DIB insured status expired.  And just as
was the case in that prior administrative proceeding, to
demonstrate that she was entitled to DIB, plaintiff was required to
prove not only that she was disabled but that she became disabled
prior to the expiration of her insured status.  Anthony v.
Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  "Any impairment which
had its onset or became disabling after the special earnings test
was last met cannot serve as the basis for a finding of
disability."  Owens v. Heckler, 770 F.2d 1276, 1280 (5th Cir. 1985).

_____

[1] Elsewhere in the administrative record the date of this
initial denial was identified as February 9, 2009.  (Tr. p. 103).

3

Following the issuance of the adverse decision by the ALJ who considered plaintiff's previous application for DIB, plaintiff indicates that she appealed that decision to the AC which upheld it on October 19, 2010.  (Rec. doc. 12-1, p. 1); (see also Tr. p. 103).  Plaintiff does not state whether she subsequently sought judicial review of that unfavorable adjudication and a review of the Court's records does not reveal that she did so in this forum. As a result, the ALJ's adverse decision of November 23, 2009 became the final, binding decision of the Commissioner, 20 C.F.R. §404.981, and adjudicated plaintiff's entitlement to DIB from the alleged onset date through the date of the adverse decision which was some seventeen months after plaintiff's insured status had expired.  Typically, under traditional notions of res judicata, that circumstance would deprive the Court of jurisdiction to review the prior adverse decision and the time period that it encompassed. Califano v. Sanders, 430 U.S. 99, 107-09, 97 S.Ct. 980, 985-86 (1977); Muse v. Sullivan, 925 F.2d 785, 787 n.1 (5th Cir. 1991). In this case, however, for whatever reason the ALJ who considered plaintiff's second application for DIB did not dismiss it on res judicata grounds under 20 C.F.R. §404.957(c)(1) but instead readjudicated plaintiff's entitlement to DIB for the time period of April 1, 2007 until June 30, 2008.[2]  (Tr. pp. 29, 37).  By doing

---

[2] In her written opinion of December 22, 2011, the ALJ made only one reference to the prior ALJ's decision.  (Tr. pp. 36-37).

4

so, the second ALJ effectively re-opened plaintiff's previous application.

In the "Statement of Errors" section of her cross-motion for summary judgment, plaintiff initially frames the issues for judicial review as follows:

1.   The ALJ denied Plaintiff the absolute right to cross-examine the consultative examiner established by *Lidy v. Sullivan* and Acquiescence Ruling 91-1(5).  In addition, the ALJ acted in an arbitrary and capricious manner by rejecting the amended onset date she solicited from the Plaintiff.

2.   The ALJ improperly assigned controlling weight to a non-examining non-treating biased physician who also testified about vocational factors and the ALJ acted as a medical doctor in contravention of relevant legal standards.

3.   The ALJ improperly rejected the treating physicians' records and opinions, assigned those opinions limited weight and did not comply with *Newton v. Apfel's* requirement that the ALJ address the six factors set forth in 20 C.F.R. 1527(d).

4.   The ALJ relied on vocational expert testimony that was fundamentally flawed because the vocational expert did not identify any occupations within the [D]ictionary of [O]ccupational [T]itle codes and was not aware of the manipulative limitations associated with the occupations she identified.   The vocational expert answered the questions based on her unstated understanding of the medical expert's "RFC", an inherently unclear and unreliable formulation.   The ALJ mistakenly asserted that transferability of skills was irrelevant and should have entered at least a partially favorable judgment for the plaintiff.

(Rec. doc. 12-1, pp. 7-8).

However, in the "Argument" section of her cross-motion, plaintiff frames the issues for judicial review in different terms:

ERROR 1:

The ALJ committed legal error by ignoring treating physician records extant prior to the Date Last Insured.  In so doing, the ALJ failed to properly assess the existence of severe medically

determinable impairments, failed to assess reopening of the prior application and mistakenly asserted the claimant's improvement of the plaintiff's progressively debilitating Rheumatoid Arthritis.

ERROR 2:

The ALJ erred in not addressing plaintiff's implied request and explicit request to reopen the prior application. She erred in failing to address Dr. Sedrish's records and in assessing whether those records constitute "new and material" evidence under 20 C.F.R. 404.989(a)(1), 20 C.F.R. 404.988.

ERROR 3:

THE ALJ EFFECTIVELY REJECTED THE TREATING PHYSICIANS' RECORDS AND OPINIONS AND DID NOT COMPLY WITH *NEWTON V. APFEL'S* REQUIREMENT THAT THE ALJ ADDRESS THE SIX FACTORS SET FORTH IN 20 C.F.R. 1527(D).

ERROR 4:

THE ALJ FORMULATED AN INCOHERENT RFC AND ONE THAT DOES NOT ACCOUNT FOR THE SEVERE MEDICALLY DETERMINABLE IM[P]AIRMENTS SHE DID FIND. THE ALJ ALSO RELIED ON VOCATIONAL EXPERT TESTIMONY THAT WAS FUNDAMENTALLY FLAWED BECAUSE THE VOCATIONAL EXPERT DID NOT IDENTIFY ANY OCCUPATIONS WITH DICTIONARY OF OCCUPATIONAL TITLE CODES AND WAS BASED ON AN UNSTATED UNDERSTANDING OF THE ALJ'S "RFC".

(Rec. doc. 12-1, pp. 11, 15, 16, 18).

As plaintiff offers no meaningful argument following the four claims that she identified in her Statement of Errors, the Court will address, as did the Commissioner, the four claims set forth in the Argument portion of plaintiff's cross-motion. Relevant to the resolution of those claims are the following findings that were made by the ALJ:

1.   [t]he claimant last met the insured status requirements of the Social Security Act on June 30, 2008.

2.   [t]he claimant did not engage in substantial gainful activity during the period from her alleged onset date of April 1, 2007 through her date last insured of June 30, 2008 (20 CFR 404.1571 *et seq*.).

3.   [t]hrough the date last insured, the claimant had the follow-ing severe impairments: inflammatory arthritis, obesity, osteoarthrosis of the knees bilaterally and depression (20 CFR 404.1520(c)); _Stone v. Heckler_, 752 F.2d 1099 (5th Cir. 1985).

4.   [t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   [a]fter careful  consideration of the entire record,  I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant needs a sit/stand option, allowing the claimant to sit or stand alternatively at will provided that she is not off task more than 10% of the work period; she can never climb ladders, ropes or scaffolds; occasionally stoop, crouch, kneel or crawl; she can perform only occasional bilateral overhead reaching; and, the work needs to be in a low stress job, defined as having only occasional changes in the work setting.

6.   [t]hrough the date last insured, the claimant was capable of performing past relevant work as a retail manager.  This work did not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.   [t]he claimant was not under a disability, as defined in the Social Security Act, at any time from April 1, 2007, the alleged onset date, through June 30, 2008, the date last insured (20 CFR 404.1520(f)).

(Tr. pp. 29, 31-32, 37).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  Anthony, 954 F.2d at 292; Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by

substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner. Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that she is disabled within the meaning of the Social Security Act.  Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not

8

disabled.  Harrell, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

> 1.  an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.
>
> 2.  an individual who does not have a "severe impairment" will not be found to be disabled.
>
> 3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.
>
> 4.  if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.
>
> 5.  if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  In determining whether a claimant is capable of performing the work that she has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities.  Villa, 895 F.2d at 1022; Hollis v. Bowen, 837 F.2d 1378, 1386 (5th Cir. 1988); Epps v. Harris, 624 F.2d 1267, 1274 (5th Cir. 1980).

9

The assessment of the demands of a claimant's prior work "... may rest on descriptions of past work as actually performed or as generally performed in the national economy." <u>Villa</u>, 895 F.2d at 1022 (citing <u>Jones v. Bowen</u>, 829 F.2d 524, 527 n.2 (5th Cir. 1987)). A finding that the claimant is disabled or is not disabled at any point in the five-step review process is conclusive and terminates the Commissioner's analysis. <u>Lovelace v. Bowen</u>, 813 F.2d 55, 58 (5th Cir. 1987).

The documentary exhibits that were generated during the relevant time[3]/ period begin with treatment records from Dr. Phillip Sedrish of the Gulf Coast Rheumatology Associates dated July 31, 2007. On that date, plaintiff received a consultation for RA pursuant to a referral from Dr. Dixit whom plaintiff had reportedly seen for hand pain and swelling for the previous six months. She indicated that she received some relief with high doses of Motrin. Active synovitis was noted in the wrists, the left greater than the right, certain "PIP" and "MIP" joints were tender but the rest of the joints were "OK". The diagnosis was RA and plaintiff was prescribed Methotrexate, Folic Acid, Prednisone, Mobic, and Restoril. (Tr. pp. 458-460). Bloodwork that was done at the time revealed high readings for Bun/Creatinine Ratio,

---

[3]/ On December 11, 2006, which was approximately four months prior to the alleged onset date, plaintiff had undergone testing at the Bogalusa Medical Center ("BMC") that was positive for RA. (Tr. p. 558).

Alkaline Phosphatase, AST, ALT, CCP IGG, C-Reactive Protein, Sedimentation Rate, and Rheumatoid Factor. Hepatitis B and C tests were negative. (Tr. pp. 466-468). On August 8, 2007, Dr. Sedrish ordered an ultrasound of the upper abdomen to rule out cholecystitis. (Tr. p. 457).

On August 10, 2007, plaintiff was seen by Dr. Glenn Butt, an internist, for complaints of a possible urinary tract infection, urinary frequency, and nocturia for the previous four weeks. She also complained of increased nervousness after quitting smoking two weeks earlier and trying to give up caffeine at the same time. Arthritis was reported but a physical examination was largely unremarkable. The diagnosis was urge incontinence, polydipsia, dysuria, and RA. Plaintiff was prescribed Chantix and Detrol and was advised to wait one month before quitting caffeine. (Tr. pp. 485-486, 510). A glucose fasting test was performed on August 13, 2007 which produced normal results. (Tr. p. 507). On August 16, 2007, an ultrasound of the abdomen was conducted in connection with plaintiff's complaint of epigastric pain off-and-on for the previous twenty years. That testing revealed a small cyst in the upper pole of the left kidney, numerous gallstones, and a hyperechoic mass in the posterior segment of the right lobe of the liver representing a hemangioma. A triple-phase CT scan of the liver was recommended for confirmation. (Tr. pp. 465, 509).

Pursuant to the radiologist's recommendation, a CT scan of the

11

abdomen, with and without contrast, was ordered by Dr. Sedrish. (Tr. p. 456). That testing produced findings consistent with a cavernous hemangioma posteriorly in the right lobe of the liver as well as ten calcified gallstones. (Tr. pp. 463, 508, 594). Bloodwork on that date demonstrated elevated Alkaline Phosphatase, ALT, and GGT levels. (Tr. p. 464).

Plaintiff returned to Dr. Sedrish on August 29, 2007 and reported "doing a lot better". The dosage of Methotexrate was increased, plaintiff was given refills on her other medications, and she was referred to general surgery. (Tr. pp. 454-455). Additional bloodwork done on that date revealed an elevated Bun/Creatinine ratio and elevated Alkaline Phosphatase, ALT, Sedimentation Rate, white blood cell count, Hematocrit, and Absolute Neutrophils. (Tr. pp. 461-462).

The next medical records were not generated until December 3, 2007 when plaintiff was seen again by Dr. Butt. Complaints at the time included anxiety over the previous thirty-six months which was worsening and resulted in a number of severe symptoms; right upper quadrant and epigastric pain following the consumption of greasy foods; and, a cough of fourteen days' duration. Results of a physical examination were unremarkable. The diagnosis was acute bronchitis, nervousness, cholelithiasis, and epigastric pain. Plaintiff was prescribed a cool mist vaporizer, fluids, rest, Tylenol and/or Motrin every four hours, Vicodin, Tessalon Perles,

Amoxicillin, and Lexparo. Methotrexate was to be discontinued until plaintiff's cough resolved, a chest x-ray was ordered, plaintiff was referred to a surgeon for further evaluation, and she was counseled on strategies to lessen her depression. (Tr. pp. 483-484). The chest x-ray was performed the following day which was negative. (Tr. p. 506).

Plaintiff was next seen by Dr. Butt on January 3, 2008 with the complaints at the time being a cough and congestion and severe fatigue since being on Lexapro. No significant findings were noted on physical examination. The assessment was acute bronchitis, fatigue, and elevated blood pressure without hypertension. Non-prescription treatment modalities were continued, pulmonary function studies were to be scheduled, Lexapro was to be discontinued, and plaintiff was given prescriptions for Tessalon Perles, Robitussin AC, Prozac, and Prednisone. (Tr. pp. 481-482). At a follow-up visit with Dr. Butt on February 13, 2008, plaintiff complained of RA symptoms to the shoulders, hands, and wrists including joint swelling, stiffness, and erythema as well as weakness. She also complained that Prozac made her too anxious. Pulmonary function test results were reportedly normal. The assessment was RA and chronic bronchitis. Further testing was to be conducted and plaintiff was referred to the rheumatologist, Dr. Sedrish, for the possible use of Enbrel. The dosage of Methotrexate was increased and plaintiff was given prescriptions

for Restoril, Prednisone, Mobic, Folate, Provera, Premarin, Celexa, and Fosamax.  (Tr. p. 480).

Further bloodwork was performed on May 22, 2008 which revealed elevated levels of WBC, Hermatocrit, Alkaline Phosphatase, AST, and ALT.  (Tr. pp. 502-503).  The following day, plaintiff returned to Dr. Butt with the chief complaint at the time being arthritic pain to the hands, wrists, and right ankle which had worsened over the previous two weeks.  Plaintiff had stopped taking Methotrexate two months earlier as she did not feel that it was beneficial.  Upon physical examination, plaintiff was noted to have a swollen and tender left wrist, tender proximal interphalangeal joints of the hands, and some tenderness in the metacarpophalangeal joints.  The assessment was RA, elevated liver enzymes, and elevated blood pressure without hypertension.  Plaintiff was referred to Dr. Feldman, a rheumatologist, for further evaluation and various tests were to be scheduled.  Methotrexate was to be discontinued if plaintiff's liver elevations increased.  Prescriptions were written for Methotrexate, Folic Acid, Prednisone, and Celexa.  (Tr. p. 479).

On June 5, 2008, additional bloodwork was done which continued to reveal elevated levels of Alkaline Phosphatase, ALT and GGT. (Tr. pp. 501, 590).  Plaintiff was seen by Dr. Butt one final time during the relevant time period on June 24, 2008.  Presenting problems were identified as:  1) elevated liver function studies

with a history of gallstones since age twenty and resulting abdominal pain when consuming greasy foods; 2) RA that was "doing well"; 3) hypertension; and, 4) a bad sunburn.  With the exception of numerous cold blisters and a second degree sunburn of the shoulders, a physical examination produced entirely unremarkable results.  The assessment was cholelithiasis, elevated liver enzymes, herpes labialis, sunburn, and abdominal pain.  Diet and testing were recommended, plaintiff was advised to use Neosporin for her sunburn, and she was referred to a surgeon for further evaluation.  Plaintiff was also prescribed Lisonpril/HCTZ, Vicodin as needed for pain, and Valtrex.  (Tr. pp. 478, 499).  Plaintiff's insured status for DIB purposes subsequently expired on June 30, 2008.[4]/

On January 6, 2011, plaintiff completed the Administration's "Function Report-Adult" form that was designed to elicit information about how her conditions limited her activities. There, plaintiff indicated that joint pain made it difficult for her to perform any activities and that prescribed medication made her drowsy.  As a result of her pain, plaintiff had not experienced a completely restful night in three years.  She needed assistance

---

[4]/ While the administrative record contains numerous treatment notes that were generated after plaintiff's last insured date of June 30, 2008, those records are relevant only to the extent that they might establish that she was disabled as of that date.  Brown v. Astrue, 344 Fed.Appx. 16, 20-21 (5th Cir. 2009); McLendon v. Barnhart, 184 Fed.Appx. 430, 431 (5th Cir. 2006); Halley v. Barnhart, 158 Fed.Appx. 645, 648 (5th Cir. 2005).

in tending to her personal needs and was only able to prepare simple, quick meals as a result of her inability to stand for long periods of time. Household chores were limited to those that plaintiff could do from a seated position and any yardwork that plaintiff performed was followed by a couple of days of bedrest. Plaintiff tried to go outside to walk or to ride in a car every other day but needed to hold onto someone for stability. She was unable to drive due to the drowsiness caused by her medications. Because her joints hurt to write, plaintiff's husband tended to the financial matters. Interests included watching TV and listening to music. Using the computer occasionally made plaintiff's fingers lock up and her condition affected all of her exertional abilities. She estimated that she could lift a quart-sized container and walk about twenty feet but would then have to sit down and rest for forty-five to sixty minutes before resuming walking. Plaintiff's ability to follow instructions was diminished as a result of her condition and she did not cope with stress or changes in routine well. The use of a cane and a wheelchair had reportedly been prescribed in 2008. (Tr. pp. 204-212).[5]/

As noted earlier, a hearing before an ALJ went forward on November 1, 2011. At the outset of the hearing, plaintiff's

---

[5]/ On December 12, 2008, subsequent to the expiration of plaintiff's DIB insured status, Dr. Butt recommended that she use a cane after she had twisted her right ankle nineteen days earlier. (Tr. pp. 475-477).

counsel confirmed that the administrative record was complete by referencing records from Dr. Ishaq that were generated after the expiration of plaintiff's insured status, a list of medications that was compiled on October 13, 2011, and a lab report from the Bogalusa Medical Center ("BMC") dated December 11, 2006 reflecting a positive result for the presence of RA.  The ALJ then noted the expiration of plaintiff's DIB insured status on June 30, 2008, the res judicata effect of the adverse decision on plaintiff's previous application for DIB, and counsel's pre-hearing brief in which she requested that the prior application be re-opened.  Counsel then made an opening statement in which she argued that plaintiff had been diagnosed with RA in 2006 which was a progressive disease that rendered her unable to work prior to the date that she was last insured.  While plaintiff's treating physicians ultimately brought her RA under control, it was nonetheless a condition that had progressed over time.  (Tr. pp. 45-53).

Plaintiff then took the stand and was questioned by her attorney.  She was fifty-four years of age at the time, had completed twelve years of formal education, and had last worked on a production line at a Folgers plant until April of 2007 where she had to lift objects weighing twenty to forty pounds.  Over time, that job became harder to perform as plaintiff experienced pain and swelling to the joints of the knees, ankles, hands, and elbows.  That increase in pain caused plaintiff to seek medical treatment

17

from the LSU Medical Center in 2006 where she was prescribed Mobic in addition to Ibuprofens she was taking.  In 2007, plaintiff went under the care of Dr. Butt, her primary care physician, and other "specialists" but no rheumatologists at the time.  After Dr. Butt had tried numerous medications which did not fully resolve her arthritic symptoms and depression, she began seeing specialists, including Dr. Ishaq, a rheumatologist, and Dr. Spady.  (Tr. pp. 54-60).

At this point in the hearing, the ALJ interjected and questioned plaintiff on whether she had discontinued prescribed medications on her own.  In response, plaintiff testified that any interruptions in her medication intake occurred at the suggestion of Dr. Butt.  Ultimately, she could not continue with her job at Folgers.  Compared with the 2007-2008 time frame, except for swelling, plaintiff's pain, numbness, and joint stiffness were worse at the time of the hearing and occurred every few hours. Reflecting back to the time that she was still working, plaintiff testified that as long as she tried to push herself she was okay but the pain and swelling at the end of the day was such that she could not even close her hands.  Plaintiff had tried to do some volunteer work at a school several weeks earlier but could not continue due to instability in ambulating.  After leaving her job in 2007, plaintiff testified that activities like walking were limited and that her husband did most of the household cleaning and

18

laundry and he continued to do.  She could cook quick meals and perform those household chores that she could do from a seated position but not tasks like mopping or sweeping.  Showering was done with the benefit of a stool which she had been using for the previous two years.  Plaintiff spent the majority of her day in a recliner with her feet elevated and ever since 2007, activities like grocery shopping were limited and were done holding onto a shopping cart for assistance.  Cold temperatures and increased activity exacerbated plaintiff's pain the most and sleep was interrupted due to stiffness.  She thus tried to shift positions every twenty to thirty minutes to get comfortable.  (Tr. pp. 60-69).

Continuing, plaintiff testified that she experienced "good" and "bad" days, with two days per week falling into the former category.  She tried to walk daily but had to use a cane when doing so outside and could walk for only ten to fifteen minutes at a time followed by a need to elevate her feet.  With some difficulty, plaintiff could lift a gallon of milk using both hands.  At the time that she was last working plaintiff was taking anti-inflammatories as well as Ibuprofen for pain relief.  Her liver enzymes began to elevate in 2009 and, after seeing a specialist in 2010, she was diagnosed with cirrhosis but no pain or physical limitations had ever resulted from that condition.  Plaintiff was no longer able to take Methotrexate due to her liver issues.  (Tr.

pp. 69-73).

Moving on to her non-exertional impairments, plaintiff testified that she first began being treated by Dr. Butt for anxiety and depression, followed by Dr. Gail Brady for bipolar disorder, anxiety, depression, and ADHD, and more recently by Dr. Witt.  The depression and anxiety had first manifested themselves when plaintiff had to discontinue work, resulting in concentration difficulties, mood changes, increased irritability, and panic attacks.  Prescribed medication caused drowsiness.  Since going under the care of a psychiatrist, however, plaintiff's mental conditions had improved but she still experienced inter-personal relationship issues which would interfere with her ability to work. (Tr. pp. 73-77).

Upon further questioning by the ALJ, plaintiff acknowledged that medication was helpful in resolving her mental health issues. She additionally testified to suffering from fibromyalgia. Cirrhosis had no limiting effects but greasy and spicy foods aggravated her gallstones.  When asked to prioritize her top three medical conditions, plaintiff identified RA, depression/anxiety, and fibromyalgia.  The doctors that plaintiff was seeing at the time of the hearing had managed to get better control of her conditions.  (Tr. pp. 77-87).

Deborah Bailey, a VE, was the next witness to take the stand. She began by characterizing the exertional and skill demands of

plaintiff's past job as a retail manager as light, skilled; those of a teacher's aide as light, low semi-skilled; and, those of a production line lead worker as medium, semi-skilled. The manager position had resulted in plaintiff having certain transferable work skills. The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who had the residual functional capacity ("RFC") to perform light-level work with an at-will sit/stand option provided that the person was not off-task more than ten percent of the work period; who could never climb ladders, ropes, or scaffolds and could only occasionally stoop, crouch, kneel, crawl, or reach overhead bilaterally; and, who needed a low-stress job with only occasional changes in the work setting. With those limitations in mind, the VE testified that the individual described in the hypothetical question would be able to perform plaintiff's past work as a retail manager as well as the jobs of general office clerk, information clerk, and counter clerk, significant numbers of which existed in the local and national economies. (Tr. pp. 88-95).

A second hypothetical question was posed to the VE by the ALJ which assumed the same profile as the first hypo except that the RFC was for sedentary-level work. Faced with that question, the VE testified that the described individual would be unable to perform plaintiff's past work but that she could perform the functions of

21

an order clerk, general office clerk, or receptionist.  Yet a third hypothetical question was posed to the VE which assumed an individual of plaintiff's age, education, and work experience; who had an RFC for sedentary work; and, due to severe pain associated with arthritis/osteoarthritis of the knees bilaterally, fibromyalgia, and mental impairments associated with depression and anxiety, had to withdraw from her work station at unscheduled times, resulting in work not being completed in a timely manner and lacking sufficient concentration, persistence, or pace to do even simple, routine tasks on a regular and continuing basis for a full eight-hour work schedule.  With those limitations in mind, the VE testified that the individual described in the third hypo could not perform plaintiff's past work or any other work.  The VE also testified that her testimony was consistent with the Dictionary of Occupational Titles ("DOT") and that the jobs that she had identified in answer to the first two hypothetical questions were representative, not exhaustive.  (Tr. pp. 95-97).

Upon being tendered to plaintiff's counsel for further questioning, the VE was asked to assume the profile set forth in the second hypothetical question coupled with an ability to sit for only forty-five minutes at a time and to stand for only fifteen minutes at a time as well as a need to take breaks every twenty minutes for about ten minutes.  In answer to that question, the VE testified that the described individual would be unable to perform

any work.  In closing, counsel argued that plaintiff's prior application for DIB should be reopened and that she should be found disabled prior to the date that she was last insured on June 30, 2008.  In so arguing, counsel pointed out that plaintiff had been diagnosed with RA in 2006 which had progressed to the point where she had to quit her job in 2007 and was unable to perform any other work.  (Tr. pp. 97-100).

On April 3, 2012, subsequent to the hearing before the ALJ, Dr. Butt authored a "To Whom It May Concern" letter to the Commissioner in which he recalled being plaintiff's primary care physician from 2007 to 2009 and in which he hoped to clarify when her RA commenced, as follows:

> [a]ccording to my records she complained of an increase in shoulder, hand and wrist pain and already had a diagnosis of Rheumatoid Arthritis on 2-13-2008.  She had been taken off o[f] methotrexate due to an earlier bronchitis.  She was having disabling pain with the inflammation characteristic of her disease at that time.  I stepped in to prescribe her methotrexate and prednisone pending referral to rheumatological specialists.  My records from 8-10-2007, her first visit with me, indicate she carried the diagnosis already.

> (Tr. p. 597).

Plaintiff challenges the Commissioner's decision to deny her Social Security benefits on four grounds.  In the first of those, plaintiff argues that the ALJ ignored treating physician records that were extant prior to the date that she was last insured and, in doing so, failed to properly assess the existence of severe medically determinable impairments, failed to assess the reopening

23

of plaintiff's prior application for DIB, and mistakenly asserted improvement of her progressively debilitating RA. More specifically, plaintiff argues that the ALJ failed to discuss records from Dr. Sedrish that were generated during the relevant time period, ignored certain treatment records from Dr. Butt, and failed to accord significant weight to the records of Dr. Ishaq.

In addressing plaintiff's first challenge, the Court initially notes that an ALJ is not required to specifically discuss all of the evidence that supports her decision or all of the evidence that was rejected. Falco v. Shalala, 27 F.3d 160, 163-64 (5th Cir. 1994). The Court also recalls the well-established principle that the mere presence of an impairment does not necessarily establish disability. McLendon v. Barnhart, 184 Fed.Appx. 430, 431 (5th Cir. 2006). Similarly, the existence of pain or the fact that an individual is unable to work without experiencing pain is not an automatic ground for obtaining Social Security benefits. Owens v. Heckler, 770 F.2d 1276, 1281 (5th Cir. 1985)(citing Jones, 702 F.2d at 621 n.4). Rather, to be disabling pain must be constant, unremitting, and wholly unresponsive to therapeutic treatment. Falco, 27 F.3d at 163.

Plaintiff is correct that on December 11, 2006, some four months prior to the alleged onset date, testing at BMC was positive for the presence of an RA factor. (Tr. p. 558). However, that test result or even a diagnosis of RA, standing alone, is

24

insufficient to establish disability unless it resulted in limitations that prevented plaintiff from performing any work. McLendon, 184 Fed.Appx. at 431. Plaintiff is also correct that the ALJ's decision makes no mention of Dr. Sedrish's treatment records that were generated during the relevant time period. With the above precepts in mind, the question thus becomes whether those records establish an inability to work prior to the expiration of plaintiff's insured status.

Plaintiff was seen by Dr. Sedrish only twice during the relevant time period. On the first occasion, July 31, 2007, plaintiff appeared for an RA consultation pursuant to a referral from Dr. Dixit and reported pain relief with high doses of Motrin. She did have active synovitis of the wrists, the left greater than the right, and tenderness to certain joints of the hand but other joints were said to be unaffected. The diagnosis was RA and various medications were prescribed. On the second occasion, August 29, 2007, plaintiff reported to Dr. Sedrish that she was "doing a lot better" and the dosage of Methotrexate was increased. On neither of these two occasions did Dr. Sedrish impose any RA-related limitations, a proper consideration in determining her disability status. Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995); Vaughn v. Shalala, 58 F.3d 129, 131 (5th Cir. 1989). While the absence of any discussion of Dr. Sedrish's two treatment notes by the ALJ was perhaps regrettable, the records themselves fail to

25

establish that plaintiff was unable to work during the relevant time period.

With respect to Dr. Butt, an internist, plaintiff was seen by him six times during the relevant time period. On the first occasion, August 10, 2007, plaintiff complained of a urinary tract infection and related symptoms. Although arthritis was reported to the doctor, his physical examination of plaintiff was essentially normal and RA appeared last on his list of diagnosed conditions. On December 3, 2007, plaintiff presented to the doctor with complaints of increased anxiety over the previous thirty-six months, right upper quadrant and epigastric pain secondary to consuming greasy foods, and a two week-old cough. Once again, a physical examination was largely unremarkable. The assessment was acute bronchitis, cholelithiasis, and epigastric pain. One month later, plaintiff was seen by Dr. Butt for a cough, congestion, and severe fatigue secondary to the use of Lexapro. Again, a physical examination was essentially normal and the diagnosis was acute bronchitis, fatigue, and elevated blood pressure without hypertension.

On February 13, 2008, plaintiff returned to Dr. Butt, this time complaining of RA-related symptoms to the shoulders, hands, and wrist. The diagnosis was RA and acute bronchitis. Although plaintiff was referred to Dr. Sedrish for the possible use of Enbrel, it does not appear that the referral ever came to fruition.

26

On May 23, 2008, plaintiff was seen for the fifth time by Dr. Butt for complaints of arthritic pain to the hands, wrists, and right ankle for the previous two weeks.  She had discontinued the use of Methotrexate two months earlier due to its perceived ineffectiveness.  A physical examination on this date did reveal a swollen, tender left wrist and tender hand joints.  The diagnosis was RA, elevated liver enzymes, and elevated blood pressure without hypertension.  Plaintiff was referred to Dr. Feldman, another rheumatologist, for additional testing and Methotrexate was to be discontinued if her liver function levels increased further. Finally, on June 24, 2008, six days before her insured status expired, plaintiff presented to Dr. Butt in connection with elevated liver function studies, gallstones since the age of twenty, abdominal pain with greasy foods, hypertension, and sunburn.  Her RA was described as "doing well".  Except for the presence of fever blisters and a sunburn to the shoulders, a physical examination was normal.  The diagnosis was cholelithiasis, elevated liver enzymes, herpes labialis, sunburn, and abdominal pain.

Just as was the case with Dr. Sedrish, in none of Dr. Butt's contemporaneous treatment notes did he impose any restrictions on plaintiff's activities, RA-related or otherwise.  Despite plaintiff's subjective complaints, Dr. Butt recorded no significant physical examination findings on the majority of plaintiff's

visits, another proper consideration.   Adams v. Bowen, 833 F.2d 509, 512 (5th Cir. 1987).   Plaintiff cites a string of Dr. Butt's records as evidence that he treated plaintiff for anxiety, gallstones, fibromyalgia, and hyperlipidemia but faults the ALJ for failing to find that those conditions were severe impairments because of a reported lack of supporting medical records.   (Rec. doc. 12-1, p. 12).   Of the cited records, only three of them document treatment that was rendered during the relevant time period and two of those were indeed discussed by the ALJ in her written opinion.   (Tr. p. 33).   The other records were generated outside the relevant time period and document new conditions or, at best, the degeneration of conditions after the expiration of plaintiff's insured status and thus fail to establish disability. See, e.g., Courville v. Astrue, No. 10-CV-1916, 2011 WL 1982624 at *5-6 (E.D. La. March 30, 2011), adopted, 2011 WL 1984359 (E.D. La. May 19, 2011).   Dr. Butt's "To Whom It May Concern" letter of April 3, 2012 establishes only that plaintiff had been diagnosed with RA prior to the expiration of her insured status, an insufficient basis for a finding of disability in and of itself, and the extent to which plaintiff's pain was "disabling" is a determination that is entrusted to the ALJ in the first instance.   Jones v. Bowen, 829 F.2d 524, 527 (5th Cir. 1987).

As for Dr. Ishaq's medical records and records that were generated by other treating physicians subsequent to June 30, 2008,

28

those do not speak to the relevant time period.  <u>See</u>, e.g., <u>Brown v. Astrue</u>, 344 Fed.Appx. 16, 20 n.3 (5th Cir. 2009).  "If a claimant has a degenerative or ongoing impairment, the relevant inquiry is whether the claimant was actually disabled during the relevant time, not whether a disease existed that ultimately progressed to a disabling condition.  Evidence showing a degeneration of a claimant's condition after the expiration of [her] Title II insured status is not relevant to the Commissioner's Title II disability analysis."  <u>McLendon</u>, 184 Fed.Appx. at 431 (citing <u>Torres v. Shalala</u>, 48 F.3d 887, 894 n.12 (5th Cir. 1995)).  None of the three doctors ever declared plaintiff to be unable to work during the relevant time period.  <u>Halley v. Barnhart</u>, 158 Fed.Appx. 645 (5th Cir. 2009).  After reviewing plaintiff's file, the Administration's MC also concluded that there was insufficient evidence to establish her disability during the time that she was last insured.  (Tr. pp. 102-107).  That opinion is entitled to due consideration in the disability adjudication process.  20 C.F.R. §404.1527(e).  This claim is without merit.

Plaintiff's second challenge to the Commissioner's decision is that the ALJ erred in failing to address plaintiff's implied and explicit request to re-open her previous application for DIB and in failing to address whether Dr. Sedrish's medical records constituted "new and material" evidence providing good cause for reopening the previous application under 20 C.F.R. §§404.989(a)(1)

and 404.988.

This challenge is a non-issue.  As was discussed <u>supra</u>, by not judicially challenging the administrative denial of her first application for DIB, plaintiff's entitlement to such benefits for the time period from April 1, 2007 until November 23, 2009, long after her disability insured status had expired, was adjudicated to her detriment.  However, instead of dismissing plaintiff's second application on <u>res</u> <u>judicata</u> grounds under §404.957(c)(1) and by readjudicating her entitlement to DIB for the time period from April 1, 2007 until June 30, 2008, the second ALJ accomplished the same result as the re-opening of plaintiff's prior application would have produced.  Although the second ALJ failed to specifically discuss Dr. Sedrish's two treatment notes, she was not obligated to do so, <u>Falco</u>, 27 F.3d at 163-64, and procedural perfection in administrative proceedings is not required.  <u>Mays v.</u> <u>Bowen</u>, 837 F.2d 1362, 1364 (5th Cir. 1988).  As discussed above, because the Court does not believe that disability was established by Dr. Sedrish's two treatment notes, substantial rights of a party have not been affected.  <u>Id</u>.  This challenge provides no basis for overturning the Commissioner's decision.

In her third challenge to the Commissioner's decision, plaintiff alleges that the ALJ improperly rejected her treating physicians' records and opinions without performing a detailed analysis of those physicians' views under the criteria set forth in

20 C.F.R. §404.1527(d).[6]/  Likening her case to that presented in Newton v. Apfel, 209 F.3d 448 (5th Cir. 2000), plaintiff argues that the ALJ effectively gave no weight to the opinions of one of her treating physicians while improperly relying on the testimony of an unidentified non-treating, non-examining physician and that, by failing to discuss the records of Doctors Sedrish, Butt, and Ishaq, the ALJ essentially gave no weight to any of her treating physicians' opinions.

As discussed above, while the ALJ's written decision admittedly contains no discussion of Dr. Sedrish's two treatment notes, those notes do not establish disability and thus would not have changed the outcome of administrative proceedings below.  And contrary to plaintiff's present assertions, a number of Dr. Butt's treatment records were indeed discussed by the ALJ.  (Tr. p. 33). Because plaintiff did not begin treating with Dr. Ishaq until some months after her insured status expired, the ALJ was under no obligation to consider those treatment records.   Brown, 344 Fed.Appx. at 20.  Be that as it may, the ALJ did discuss multiple records from a number of plaintiff's treating physicians that were generated increasingly remote in time from the period when she was

_____

[6]/ The §404.1527(d) analysis, now codified at §404.1527(c), requires consideration of: 1) the physician's length of treatment of the claimant, 2) the physician's frequency of examination, 3) the nature and extent of the treatment relationship, 4) the support of the physician's opinion afforded by the medical evidence of record, 5) the consistency of the opinion with the record as a whole, and 6) the specialization of the treating physician.

insured for DIB purposes.  (Tr. pp. 33-36).  In doing so, the ALJ cited with approval certain aspects of Dr. Spady's opinions as being consistent with the RFC that she ultimately arrived at.  (Tr. p. 36).  The opinions of Dr. Witt, on the other hand, were found to be less persuasive as they were based on the opinions of plaintiff's primary care physician.  (Id.).

In Newton, supra, the ALJ was found to have improperly given essentially no weight to the opinions of the claimant's treating rheumatologist, Dr. Raymond Pertusi, while giving considerable weight to the testimony of a medical expert, Dr. Otto Willbanks, who had testified at the administrative hearing but was not a rheumatologist and had never examined or treated the claimant. Newton, 209 F.3d at 453-57.  By contrast, no medical expert appeared and testified at plaintiff's hearing before the ALJ.  In addition, unlike the facts presented in Newton, the ALJ did not reject out of hand the opinions of her treating physician in favor of those of a non-treating, non-examining physician who lacked the specialization that the claimant's treating physician possessed. Instead, the ALJ in the present case found some of plaintiff's treating physicians' opinions to be persuasive while others were deemed to be less so.  Because the record contains medical evidence from a range of treating physicians, some of which the ALJ found to be credible, she was under no obligation to perform the §404.1527(d) analysis.  Newton, 209 F.3d at 453; Holifield v.

<u>Astrue</u>, 402 Fed.Appx. 24, 27 (5th Cir. 2010).  Just like the ALJ who considered plaintiff's first application for DIB, the ALJ noted that the MC in the present case had found that there was insufficient evidence to prove up plaintiff's disability during the relevant time period.  (Tr. pp. 36-37).  As noted earlier, the Court believes that that decision was a correct one.

Plaintiff's fourth and final challenge to the Commissioner's decision is that ALJ formulated an "incoherent" RFC assessment that did not account for the severe medically determinable impairments that she did find and improperly relied on VE testimony that was fundamentally flawed because the VE failed to identify available jobs with DOT codes and because it was based on an unstated understanding of the ALJ's RFC.

In addressing this contention, the Court first notes that the determination of whether a claimant can perform her past work at the fourth step of the §404.1520 analysis, as was done in this case, can be made by an ALJ without the benefit of testimony from a VE.  <u>Williams v. Califano</u>, 590 F.2d 1332, 1334 (5th Cir. 1979); <u>Gray v. Sec. of Health, Education and Welfare</u>, 421 F.2d 638, 639 (5th Cir. 1970); <u>Laurent v. Astrue</u>, No. 07-CV-3831, 2009 WL 959463 at *11 (E.D. La. March 26, 2009), <u>aff'd</u>., 366 Fed.Appx. 559 (5th Cir. 2010).  That fact notwhthstanding, in answer to the first hypothetical question that was posed to her, the VE testified that the individual described therein could not only perform plaintiff's

past work as a retail manager but could also function as a general office clerk, information clerk, or counter clerk. Accordingly, the ALJ would have been justified in alternatively denying plaintiff's application for DIB at the fifth step of the §404.1520 analysis. Had the ALJ done so, because she had previously concluded that plaintiff suffered from severe impairments which included depression, she would have been required to rely upon vocational testimony or other similar evidence to establish that other jobs that plaintiff could perform did, in fact, exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)). "The value of a vocational expert is that [s]he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1985). "A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job." Id.

Recognizing that the DOT is not comprehensive, because it cannot and does not purport to include each and every specific skill and qualification for a particular job, the Fifth Circuit in Fields even went so far as to conclude that the DOT is not "similar evidence" that would satisfy the Commissioner's burden of proof at the fifth step of the sequential analysis. Fields, 805 F.2d at

34

1170-71.  "DOT job descriptions should not be given a role that is exclusive of more specific vocational expert testimony with respect to the effect of an individual claimant's limitations on his or her ability to perform a particular job."  Carey v. Apfel, 230 F.3d 131, 145 (5th Cir. 2000).

As was discussed earlier, given the administrative denial of plaintiff's first application for DIB, the ALJ in the present case would have been justified in dismissing plaintiff's second application on res judicata grounds under §404.957(c)(1).  Instead, the ALJ proceeded to readjudicate plaintiff's entitlement to DIB during the relevant time period.  Although the ALJ could have decided this "fourth step" case on her own, Williams, 590 F.2d at 1334, she opted to utilize the services of a VE.  Having done so, the ALJ was required to reasonably incorporate in her hypothetical question to the VE only those disabilities which she recognized. Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994).

In the Court's opinion, the RFC assessment that was arrived at by the ALJ and which she incorporated in her first hypothetical question to the VE contained limitations that were more restrictive than those that were supported by the objective evidence that was generated during the relevant time period.  The questions that were posed to the VE by the ALJ were apparently understood by her as they were answered without difficulty.  The VE also testified that her testimony was consistent with the information contained in the

DOT.  Despite the VE being properly tendered to plaintiff's counsel
to correct any perceived deficiencies in the hypothetical questions
or to address the alleged ambiguities of which she now complains,
counsel failed to avail herself of that opportunity.  Plaintiff
should not now be heard to complain of the adequacy of the ALJ's
hypothetical questions to the VE when any alleged ambiguities
therein were not deemed sufficient to merit adversarial development
in the administrative hearing that was held below.  Carey, 230 F.3d
at 146-47.  The plain fact of the matter is that between
plaintiff's two applications for DIB, two sets of Administration
medical consultants, two separate ALJ's, and two AC's have
determined that the evidence failed to establish plaintiff's
disability during the relevant time period.  The Court believes
that those determinations were correct ones.

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's
motion for summary judgment be denied and that defendant's motion
for summary judgment be granted.

A party's failure to file written objections to the proposed
findings, conclusions, and recommendation contained in a magistrate
judge's report and recommendation within fourteen days after being
served with a copy shall bar that party, except upon grounds of
plain error, from attacking on appeal the unobjected-to proposed
factual findings and legal conclusions accepted by the district

court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this __27th__ day of ___December___, 201_3_.

_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

37